# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**DAVID RAE** | Nos. 19-cr-247 (KM), 19-cr-895 (KM)<br><br>**OPINION & ORDER** |

**KEVIN MCNULTY, U.S.D.J.:**

On December 13, 2019, David Rae entered into a plea agreement with the United States Attorney for the District of New Jersey related to his participation in an international medical fraud and money laundering scheme. (DE 59.)[1] On February 7, 2020, he was sentenced pursuant to that agreement to time served, an order of forfeiture of his interests in two bank accounts, and a consent money judgment of $1,775,000. Rae now argues that the government has breached the plea agreement and has filed a motion (DE 99) for relief from the money judgment. For the reasons set forth below, Rae's request is **DENIED**.

## I. BACKGROUND

David Rae met Neil John Aaron Williamsky at a car race in the summer of 2018. (PSR ¶ 35.) Williamsky told Rae that he wanted to reduce the amount he paid in taxes. (*Id.*) Rae assisted Williamsky by laundering funds, including funds Williamsky had obtained by defrauding Medicare through offshore

---

[1] Certain citations to the record are abbreviated as follows:

DE = unless otherwise specified, docket entry in case no. 19-247

Plea Agreement = Plea Agreement with David Rae, December 13, 2019 (DE 59)

Mot. = Rae's letter motion arguing his plea agreement was breached (DE 99)

Opp. = Government's brief in opposition (DE 130)

PSR = Presentence Investigation Report (DE 130, Ex. 1)

accounts, for which Rae received a sizeable fee. (*Id.* ¶ 44.) Three offshore accounts are relevant to Rae's motion: the Cargill account, the Sympatic account, and the Roshaw account. Rae controlled a British Virgin Islands company called Cargill Consulting Ltd. ("Cargill"), which had a bank account in Hong Kong. (*Id.* ¶ 35.) Williamsky's funds were transferred first from the United States to the Cargill account. (*Id.* ¶ 36.) Rae would then transfer funds from the Cargill account to the New Zealand account of Sympatic Global Solutions Limited Partnership (the "Sympatic account"), to which Williamsky had access.² (Opp. at 10.) In addition, some funds were transferred to another New Zealand account, that of Roshaw LP (the "Roshaw account"). (*Id.* at 11.) In total, Rae transferred $1,650,000 of Williamsky's money, but the conspirators were soon caught in an FBI sting operation, which led to their indictment in April 2019. (*Id.* 12–14.)

Rae cooperated with investigators and arrived at a plea agreement, dated December 13, 2019. (DE 59) Pursuant to the agreement, on December 19, 2019, Rae pleaded guilty to two counts, one of conspiracy to commit international money laundering in violation of 18 U.S.C. § 1956(h) and one of money laundering in violation of 18 U.S.C. § 1956(a)(3). The government stipulated to a total Sentencing Guidelines offense level of 25. (Plea Agreement at 12–13; *see also* Plea Hearing Tr., DE 72.)

Recognizing Rae's cooperation and acceptance of responsibility, at sentencing the government moved for a downward departure, and Rae was sentenced to time-served plus the money judgment and forfeiture discussed below. (Opp. at 27; DE 63, 65.) Rae was sentenced to pay a money judgment to the United States of $1,775,000, the approximate value of the money he laundered as charged in the indictment.³ (*Id.*) In addition to the money

---

² The Sympatic account was controlled by a trust for which Rae was the beneficiary, but Williamsky had the power to direct the disposition of funds from the account. (Opp. at 50.)

³ In addition to the $1,650,000, Rae also laundered an additional $125,000 as part of the FBI sting operations which led to his indictment. (Opp. at 11–12.)

judgment, Rae agreed to "forfeit all of his right, title, and interest in" the Cargill and Sympatic Accounts. (Plea Agreement at 5, 14.) The plea agreement continued,

> For the avoidance of doubt, RAE understands and agrees that the list of property on Schedule B [*i.e.*, the Cargill and Sympatic accounts] does not include all of the property he is required to forfeit. RAE further understands and agrees that he is obligated under this plea agreement to forfeit (i) all property involved in the money laundering offenses charged in Counts Eight and Nine of the 19-247 Indictment; (ii) all property involved in the money laundering offense charged in Count One of the 19-895 Indictment; and (iii) all property traceable to such property; and (iv) substitute assets as necessary to satisfy the Money Judgment. Any forfeited money and the net proceeds from the disposition of the Specific Property will be applied to the Money Judgment, in partial satisfaction thereof.

(*Id.* at 5.)[4] The money judgment and specific property forfeitures in the Plea Agreement were embodied in a consent judgment. (DE 60.)

Finally, the government agreed that, if Rae complied with the terms of the Plea Agreement, it would "not *initiate* any further *criminal charges* against RAE for his role in an international money laundering scheme involving Neil John Aaron Williamsky and others occurring from in or around August 2018 through in or around April 2019." (Plea Agreement at 1–2 (emphasis added).) The Plea Agreement later emphasized that it

> is limited to the United States Attorney's Office for the District of New Jersey and cannot bind other federal, state, or local authorities. … This agreement was reached *without regard to any civil or administrative matters* that may be pending or commenced in the future against RAE. This agreement does not prohibit the United States, any agency thereof (including the Internal Revenue

---

[4] The provision for Rae to provide "substitute assets" was included because the government evidently did not believe his interest in the Cargill and Sympatic accounts would satisfy the money judgment, given that the government believed that the funds in the Sympatic account were owned by Williamsky, not Rae. (Opp. at 46–50.) In the court's experience, such a specification is also typically included because it is possible for a money launderer to have emptied the relevant accounts, or simply spent the money, before indictment. Thus, forfeiting the money remaining in the account would be a meaningless penalty.

> Service and Immigration and Customs Enforcement) or *any third party* from initiating or prosecuting any civil or administrative proceeding against RAE.

(*Id.* at 7 (emphasis added).) Finally, the Plea Agreement contains a merger clause. (*Id.* at 8.)

Not mentioned in the Plea Agreement is the Roshaw account. Although in early plea negotiations, the government had wanted Rae to forfeit the Roshaw account, by the time the agreement was finalized, all references to the Roshaw account had been excised.[5] (Opp. at 17, 21.)

In May 2019, after receiving a suspicious activity report, New Zealand authorities began investigating Rae's money laundering related to the Sympatic and Roshaw accounts. (*Id.* at 16.) After communicating with the FBI regarding Rae's case, the New Zealand authorities requested an affidavit demonstrating that the two accounts contained criminal proceeds. (*Id.* 16–17.) FBI Special Agent Marc VanZetta prepared a draft of the requested affidavit, which was transmitted to New Zealand on November 19, 2019. VanZetta described how the two accounts were related to the money laundering scheme and requested the repatriation of the Sympatic funds and up to $196,882.09 of the Roshaw funds to the United States. (*Id.* at 17.) The draft affidavit was finalized on February 5, 2020, but was not updated to reflect the fact that Rae had entered a plea agreement that made no reference to the Roshaw account, and that the government was no longer seeking the repatriation of those funds. (*Id.* at 17–18, 35.)

A few days after Rae was sentenced in December 2019, New Zealand authorities began a civil action to restrain the funds in the Sympatic and Roshaw accounts. At this point, the New Zealand authorities were not aware

---

5   The government states in its brief that that laundered funds, specifically Rae's 21% fee, were indeed deposited into the Roshaw account. (*Id.*) AUSA Barbara Ward claims she specifically told Rae that removing the account from the plea agreement would not prevent New Zealand authorities from taking legal action against the account, a contention which Rae rejects. (Opp., Ex. G ¶ 12–13.) *See* discussion *infra.*

that the United States had removed all reference to the Roshaw account from Rae's Plea Agreement, and the VanZetta affidavit, originally drafted in November 2019 and finalized in February 2020, would not have informed them of that. (*Id.* at 35–36.) In March 2020, the United States government recognized the error in the February affidavit. In May 2020, it transmitted to New Zealand a new affidavit, clarifying that the United States no longer sought the repatriation of the Roshaw funds. (*Id.* at 36.) The New Zealand authorities, however, continued to pursue the civil case against both the Sympatic and Roshaw accounts. In November 2020, the New Zealand High Court upheld the restraint on those accounts, finding that there were reasonable grounds to believe Rae had committed money laundering in violation of New Zealand and American law. (*Id.* at 38.) The New Zealand High Court dealt specifically with the issue of the February 2020 affidavit: It found that the February affidavit had not been intended to mislead the New Zealand authorities and that nothing in Rae's Plea Agreement prevented New Zealand from restraining the Sympatic and Roshaw accounts under New Zealand Law. (*Id.* at 39.)

I summarize where things stood when Rae filed the letter motion at issue here: Rae had entered into a Plea Agreement and pleaded guilty to two counts related to money laundering. His sentence had three elements: 1) a custodial sentence of time-served, 2) a $1,775,000 money judgment, and 3) the forfeiture of his interests in the Cargill and Sympatic accounts, the value of which would be applied toward the money judgment. The New Zealand authorities, acting under New Zealand law, then restrained the Sympatic and Roshaw accounts, a decision upheld by the New Zealand High Court.

In his letter motion (Mot.), Rae argues that the government breached the Plea Agreement and that he should therefore be relieved from the money judgment. The legal basis of Rae's argument is not entirely clear, but the letter motion does provide 16 numbered ways in which the government allegedly breached the Plea Agreement. (Mot. at 10–12.) These can be grouped into five categories.

5

First, Rae contends that the government made various representations to the New Zealand authorities that departed from the terms of the Plea Agreement. These contentions are included as numbered parts ii, iii, iv, v, x, xi. (*Id.* 10–11.) For example, "Stipulating that Cargill and Sympatic were not sham companies in the USA but then contending the exact opposite in the New Zealand proceedings." (*Id.* at 10.)

Second, Rae argues that AUSA Barbara Ward lied in her testimony in New Zealand. (*Id.* at 11.) These contentions are included as numbered parts xii, xiii, xiv.

Third, Rae argues that the government manipulated him into pleading guilty by "causing" New Zealand to pursue funds that the government assured him it was not pursuing, such as the Roshaw account, and by then not allowing him to pay his money judgment from the Sympatic account. These contentions are included as numbered parts i, vi, vii, viii, ix.

Fourth, Rae argues that these actions forced him to reveal in New Zealand court that he was a cooperating witness. (*Id.*) This contention is included as numbered part xvi.

Fifth, in his most specific allegation, and the only one that cites a specific provision of the Plea Agreement, Rae argues that "The Plea Agreement is breached because the USA did initiate further criminal charges to be considered in New Zealand by providing affidavit evidence and oral evidence of criminality it had stipulated it would not pursue in the USA." (*Id.*) This contention is numbered part xv.

The government, for its part, contends that none of these alleged actions violate the terms of the Plea Agreement and that it did not "initiate" the New Zealand civil action. (Opp.)

On April 16, 2021, Rae filed this motion as a sealed letter, but did not format or designate it as a motion on the docket. (DE 99.) The government filed a response on July 2, 2021. Upon receiving a letter request regarding the status of the motion, the court reviewed the docket and instructed the clerk to

6

docket the letter as a motion (DE 99) and file the related sealed documents seriatim on February 1, 2022. (DE 100–109.)

## II. DISCUSSION

When a defendant asserts that the government has breached a plea agreement, the Court must "determine whether, under contract law principles, the Government breached the plea agreement." *United States v. Trant*, 389 Fed. App'x. 122, 125 (3d Cir. 2010). In doing so, I remain "mindful of the government's tremendous bargaining power and strictly construe the text of the Agreement against the government." *United States v. Schwartz*, 511 F.3d 403, 405 (3d Cir. 2008).

The Third Circuit has established a three-step procedure for evaluating such disputes. "First, we will identify the terms of the agreement and the alleged improper conduct of the government. Second, we will determine whether the government violated its obligations under the plea agreement. Third, we will fashion an appropriate remedy for any violations that occurred." *United States v. Nolan-Cooper*, 155 F.3d 221, 235 (3d Cir. 1998). After identifying the terms of the agreement, I determine that the government did not breach the Plea Agreement.

### A. The Plea Agreement

I first examine the language of the Plea Agreement to determine its meaning. "In determining whether the terms of a plea agreement have been violated, [the] court must determine whether the government's conduct is inconsistent with what was reasonably understood by the defendant when entering the plea of guilty." *United States v. Badaracco*, 954 F.2d 928, 939 (3d Cir. 1992) (quoting *United States v. Nelson*, 837 F.2d 1519, 1521–22 (11th Cir. 1988)). "However, cases of disappointed but unfounded expectations must be carefully distinguished from those in which the defendant's expectations as to his sentence are predicated upon promises by the Government or statements from the court." *Id.* (quoting *United States v. Crusco*, 536 F.2d 21, 24 (3d Cir. 1976)).

Here, the Plea Agreement was, by its explicit terms, an agreement with the United States Attorney's Office for this District only, and did not bind any other entity. The Agreement contains four key elements: First, a recommendation on a custodial sentence, which is not at issue here; Second, the money judgment of $1,775,000; Third, the forfeiture of Rae's interest in the Cargill and Sympatic accounts; and Fourth, the government's agreement not to initiate a future criminal prosecution of Rae. The second and third elements, and the relation between them, lie at the heart of many of Rae's arguments.

### i. The Money Judgment and Forfeitures

The Plea Agreement differentiates the money judgment from the "specific property" forfeiture. In short, the Plea Agreement requires Rae to pay the total amount of money laundered and also requires him to "forfeit all of his right, title, and interest" in the Sympatic and Cargill accounts. Because Rae was laundering money for Williamsky, who owned the funds, it would be natural to conclude that Rae's interests in the two accounts used for the money laundering would not be sufficient to satisfy the $1,775,000 money judgment. At any rate, the Plea Agreement covered that possibility by providing that Rae would be obligated to turn over "substitute assets." It specifically contemplates such a shortfall, providing that "[a]ny forfeited money and the net proceeds from the disposition of the Specific Property will be applied to the Money Judgment, in *partial* satisfaction thereof." (Plea Agreement at 5 (emphasis added).)

One of Rae's objections arises from the fact that the Sympatic account contained approximately $6,000,000, more than enough money to satisfy the $1,775,000 money judgment. (Mot. at 13.) Rae believes that the funds in the Sympatic account would easily meet his obligations. The dispute arises because Rae agreed to forfeit, and could only have forfeited, "his right, title, and interest" in the Sympatic account. The government observes that Williamsky, not Rae, was the true owner of the funds in the account: "[T]he funds in the Sympatic Account do not belong to the Defendant. Rather, they are criminal proceeds obtained by Williamsky," and Rae was at best a straw

8

owner as part of the money laundering scheme. (Opp. at 50.) As a result, the government also required Williamsky, as part of his plea agreement, to forfeit Williamsky's interest in the funds in the Sympatic account. (DE 44 at 17.) Williamsky and Rae, between them, gave up all claims to the Sympatic account.

Rae could not forfeit more than he actually owned. It was inherent in the money laundering scheme that this money was Williamsky's (and that it represented proceeds of Williamsky's illegal activities). (*See, e.g.,* Plea Hearing Tr. at 23–26) It is clear on the face of the Plea Agreement that Rae was required to forfeit his interests – *whatever those may have been* – in the Cargill and Sympatic accounts. If the amount of those interests equaled or exceeded $1,775,000, the money judgment would be satisfied. If the amount forfeited was less than $1,775,000, as the government anticipated, Rae would be required to satisfy the money judgment using "substitute assets."

In any event, the funds in the Sympatic account have been restrained by New Zealand and thus are no longer available to Rae, or anyone else. The Plea Agreement did not purport to bind the New Zealand authorities or to guarantee the continued availability of such funds.[6]

Under the clear terms of the Plea Agreement, then, Rae is responsible to pay the money judgment of $1,775,000.

**ii.   Future Prosecutions**

In the Plea Agreement the government – actually, the United States Attorney for this District – agreed narrowly not to prosecute Rae criminally in the future for his money laundering activity with Williamsky. The Plea Agreement stated that the U.S. Attorney's Office for the District of New Jersey "will not *initiate* any further *criminal* charges against RAE for his role in an international money laundering scheme involving Neil John Aaron Williamsky

---

[6]   The Cargill account is one source of assets to satisfy the judgment. The Rashow account, another possible source of substitute assets, was also restrained by New Zealand and thus is also not accessible to Rae.

and others occurring from in or around August 2018 through in or around April 2019." (Plea Agreement at 1–2 (emphasis added).) The Plea Agreement explicitly contemplated future civil and administrative proceedings against Rae, even within the District of New Jersey, and notes that it "does not prohibit the United States, any agency thereof (including the Internal Revenue Service and Immigration and Customs Enforcement) or *any third party* from initiating or prosecuting any civil or administrative proceeding against RAE." (*Id.* at 7 (emphasis added).) As an international money launderer is surely aware, antipodean foreign governments are "third parties" that are not bound by agreements on behalf of the U.S. Attorney for the District of New Jersey.

      Nothing in the Plea Agreement states that the U.S. Attorney for the District of New Jersey is forbidden from participating, assisting, or providing information in other jurisdictions' civil or criminal proceedings, even within the United States. Nor does the Plea Agreement state that, in providing assistance to other jurisdictions, the AUSAs and FBI agents who participated in the prosecution are limited to only sharing the facts that Rae admitted as part of his guilty plea. In fact, the *only* limitation on the post-plea actions of any division of the United States government is that the U.S. Attorney for the District of New Jersey will not *initiate criminal* charges related to Rae's money laundering with Williamsky between August 2018 and April 2019. That is a very narrow prohibition.

      To summarize the aspects of the Plea Agreement at issue here: The Plea Agreement required Rae to forfeit whatever interest he had in the Cargill and Sympatic accounts. The Plea Agreement contemplated that such a forfeiture would not be sufficient to cover the $1,775,000 money judgment, and thus obligated Rae to forfeit "substitute assets" to cover the balance of the money judgment. The Plea Agreement also restrained the U.S. Attorney for the District of New Jersey from initiating criminal charges related to Rae's money laundering for Williamsky, but contained no other prohibitions of the future actions of any other part of the United States government, let alone foreign governments.

10

### B. The United States did not breach the Plea Agreement

When evaluating whether the government's conduct constitutes a breach of a plea agreement, the Court must be careful to strictly hold the government to the terms and reasonable expectations arising from its plea agreements. "This requirement prohibits, therefore, not only explicit repudiation of the government's assurances, but must in the interests of fairness be read to forbid end-runs around them." *United States v. Pressley*, 865 F. Supp. 2d 606, 614 (D.N.J. 2012) (quoting *United States v. Rivera–Rodriguez*, 489 F.3d 48, 57 (1st Cir. 2007)). "[B]ecause a defendant gives up multiple constitutional rights by entering into a plea agreement, courts must carefully scrutinize the agreement to insure that the government has fulfilled its promises." *United States v. Williams*, 510 F.3d 416, 422 (3d Cir. 2007).

The Plea Agreement contains multiple elements, and Rae lists some sixteen separate claims of breach, falling into five categories, as outlined above. I will examine Rae's theories in the following order: 1) the representations made to New Zealand authorities that differed from the Plea Agreement, 2) AUSA Ward's alleged misstatements to the New Zealand court, 3) the alleged manipulation leading up to the guilty plea by causing New Zealand to pursue funds the United States had said it would not pursue, 4) Rae being forced to reveal he was a cooperating witness in New Zealand Court, 5) the initiation of criminal charges in New Zealand. (Mot. at 10–12.)

First, Rae argues that the government breached the Plea Agreement by testifying to facts in New Zealand that went beyond Rae's specific stipulations in his Plea Agreement or admissions in his allocution. Rae points to nothing in the Plea Agreement that limits how any division of the United States government can discuss his case, or requires it to conceal pertinent facts. Facts do not disappear simply by virtue of Rae's having failed to stipulate to them.[7]

---

[7]   Indeed, even a U.S. sentencing court is not bound to a defendant's allocution, but is obligated to consider a wide range of relevant conduct. *See generally* U.S.S. G. § 1B1.3.

11

The government, for its part, agreed only to the guidelines offense levels and adjustments, not specifically to the underlying facts as such. (Plea Agreement Schedule A, pp. 10–13.) Nothing in the Plea Agreement forbids agents of the government, for example, from informing the New Zealand authorities that the Roshaw account contains laundered funds, even if the government removed all reference to the Roshaw account from the Plea Agreement and gave up on seeking the repatriation of those funds. (Mot. at 6, 10.) Because no provision of the Plea Agreement limited the prosecution's ability to share information or participate in legal proceedings brought by other sovereigns (or authorities within the United States, for that matter), doing so did not breach the Plea Agreement.

Next, Rae alleges that AUSA Ward made misstatements of fact to the New Zealand court. (Mot. at 11.) Such misstatements, however, are unrelated to the substance of the Plea Agreement (except insofar as they relate to the proceedings brought by New Zealand authorities, discussed below). Again, Rae cites no provision of the Plea Agreement that was violated by Ward's alleged misstatements. If Rae chooses, and the laws of New Zealand allow, he could potentially challenge the veracity of such statements in the New Zealand proceedings, but they do not breach any term of the Plea Agreement.

Third, Rae argues that the government manipulated him into pleading guilty by 1) withholding the fact that it was in communication with the government of New Zealand and that accounts that the United States had disclaimed an interest in could still be seized by New Zealand and 2) led him to believe he could pay his $1,775,000 money judgment from the Sympatic account. (Mot. at 10–11.) Rae states that he pleaded guilty against the background of a number of "assurances" that he believed were given to him, but were not included in the Plea Agreement.[8] (*Id.* at 5.) The Agreement itself,

---

[8]   AUSA Ward asserts to the contrary that Rae was warned specifically that the government of New Zealand could, under its own laws, pursue his illicit proceeds. (Opp., Ex. G ¶ 12–13.) Given the explicit terms of the Plea Agreement, it is unnecessary to reach that factual issue.

12

signed by Mr. Rae, provides that it supersedes any previous agreements, and that "[n]o additional promises, agreements, or conditions have been made or will be made unless set forth in writing and signed by the parties." (Plea Agreement at 8.) In open court, Mr. Rae acknowledged that he had thoroughly reviewed the plea agreement with his attorney and that it constitute "a complete statement of [his] agreement to plead guilty to these charges." (Plea Hearing Tr. at 8, DE 72)

As discussed above, the Plea Agreement did not include any provision whatever that would limit information sharing between the government and third parties. Indeed, the Plea Agreement affirmatively contemplated that third parties might pursue both criminal and civil proceedings against Rae. I find that the U.S. government's cooperation with New Zealand authorities, both before and after the Plea Agreement was reached was in no way an "end-run" around the provisions of the Plea Agreement. *Pressley*, 865 F. Supp. 2d at 614. The Agreement contained no promise by the government not to share information about Rae's activities nor to limit the information it shared to only facts that were included in the Plea Agreement. If Rae wanted the supposed assurances to be enforceable, he should not have agreed to a plea that did not include them.

It is unclear why Rae believed that he could pay the money judgment from the Sympatic account, although it would of course have been convenient for him to satisfy the money judgment using Williamsky's ill-gotten funds. (Mot. at 11.) The government argues in its briefing that Rae was merely a nominee and the true owner of the account was Williamsky.[9] (Opp. at 48–50.) Significantly, *Rae does not even forthrightly argue that he was the actual owner of the funds in the Sympatic account.* Indeed, as noted above, it was inherent in the money laundering scheme that this money was Williamsky's (and that it represented proceeds of Williamsky's illegal activities). (See, e.g., Plea Hearing

---

[9]   In Williamsky's plea agreement, he agreed to forfeit "any and all funds" in the Sympatic account. (DE 44 at 17.)

Tr. at 23–26.) Rather, Rae appears to suggest that he has some type of moral claim to use the money because without his cooperation, the prosecution would not have known about it: "The USA was aware, from Mr. Rae, and nobody else of the existence of $6m in Sympatic." (Mot. at 13.) That intuition has no basis in law, however, and does not give rise to a claim of violation of the Plea Agreement. The Plea Agreement itself clearly contemplates that Rae's interest in the Cargill and Sympatic accounts would not be sufficient to cover the $1,775,000 money judgment and that substitute assets would be required. (Plea Agreement at 4.) Requiring Rae to forfeit his interests in the two accounts and also pay the balance of the money judgment is in no way a "double recovery," if only because Williamsky was the owner of the funds. (Mot. at 15.) Rather, the government extinguished all potential claims to these funds, and sought the full amount of laundered funds from Rae, as it has a right to do under the relevant statutes. *See* 18 U.S.C. § 1956(a)(1); § 982(a)(1).[10]

In any event, the issue is now moot because the New Zealand authorities, not the American authorities, have seized the Sympatic account, removing whatever interest, rightful or wrongful, that Rae could claim, and rendering it unavailable for payment of the money judgment against Rae. Unless the actions of the New Zealand authorities could be attributed to the prosecution, the issue would be no different than if the money had been somehow lost or stolen before Rae could use it to satisfy the judgment.

In short, I find that the government did not breach the Plea Agreement with respect to the Sympatic account.

Next, Rae argues that the government caused New Zealand to bring proceedings against him, knowing that to defend himself, Rae would have to "a.

---

[10]   18 U.S.C. § 1956(a)(1) allows fines of "of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater" while 18 U.S.C. § 982(a)(1) mandates the forfeiture "to the United States any property, real or personal, involved in such offense, or any property traceable to such property." At any rate, it is a common feature of forfeiture proceedings that the claimant will seek to extinguish all competing claims to the property, whether or not they are ultimately valid.

14

Waive his legal privilege. b. Expose his status as a co-operating witness. c. Expose that he had a 5K1." (Mot. at 12.) The existence, though not the particulars, of Rae's cooperation and the 5K motion are public. (*See* Sentencing transcript at 5–6, DE 65.) At any rate, it is not clear how Rae's choice of what to reveal in defending the New Zealand proceedings can be laid at the door of the United States Attorney for this district. More fundamentally, this point only makes sense if it is located downstream of the argument that the United States initiated the New Zealand proceedings in violation of the Plea Agreement. It is to that argument that I turn.

Rae contends that the Plea Agreement was breached "because the USA did initiate further criminal charges to be considered in New Zealand by providing affidavit evidence and oral evidence of criminality it had stipulated it would not pursue in the USA." (Mot. at 11.) As discussed above, the Plea Agreement states that the U.S. Attorney for the District of New Jersey "will not *initiate* any further *criminal* charges against RAE for his role in an international money laundering scheme involving Neil John Aaron Williamsky and others occurring from in or around August 2018 through in or around April 2019." (*Id.* at 1–2 (emphasis added).) Rae's argument that the New Zealand proceedings breached the Plea Agreement thus encounters two immediate problems: (a) no *criminal* charges have been brought against him in New Zealand, and (b) the civil forfeiture proceedings that he does face in New Zealand were not initiated by the U.S. Attorney for the District of New Jersey.

There is no allegation that New Zealand has brought criminal proceedings against Rae at all. This he implicitly, if cagily, admits in his letter motion: "the USA did initiate further criminal charges *to be considered* in New Zealand." (Mot. at 11 (emphasis added).) It is unknown whether the New Zealand authorities ever "considered" bringing criminal charges, but the only actual New Zealand proceeding against Rae is a civil forfeiture. It was pursuant to those civil proceedings that his accounts were restrained, a decision which

15

Rae has appealed.[11] (Opp. at 34–39.) In the New Zealand proceedings, Rae raised many of the same objections that he raises here, but they were rejected by the New Zealand High Court. (*Id.* at 38–39.) Thus, because the New Zealand proceedings were civil, not criminal, they could not cause the Plea Agreement to be breached.

What is more, even if the New Zealand authorities were to initiate a criminal prosecution of Rae in the future, that would not violate the Plea Agreement, either. As the New Zealand High Court notes accurately, "there is nothing about the plea and forfeiture agreement, and the related orders of the United States District Court, that prevents criminal or civil proceedings in New Zealand in relation to the same matters." (Opp., Ex 19, ¶ [71].) The Plea Agreement bars only the U.S. Attorney for the District of New Jersey from initiating further criminal charges related to the laundering of Williamsky's money. As the plea agreement contemplates, other divisions of the United States government as well as third parties, including foreign governments, could bring criminal, civil, and administrative proceedings against Rae. (Plea Agreement at 7.)

I pursue a second issue *arguendo.* Even if civil proceedings fell within the Plea Agreement's prohibition, the claim would fail because the prosecution did not and could not "initiate" such proceedings in New Zealand. The U.S. Attorney's Office has no authority in that country, and independent actions taken by the autonomous New Zealand authorities break whatever but-for causal chain can be posited.[12] It is not disputed that agents of the United

---

[11]   It appears that under New Zealand's civil forfeiture law, the court must consider whether there is sufficient evidence that the funds in the account were related to a violation of a New Zealand or foreign law. Thus it is true, to some extent, that the criminal law of the United States and New Zealand was "considered" in the civil forfeiture proceedings. (See Opp., Ex. 19 ¶ [26]–[40]) There is, however, no evidence that criminal *charges* were brought against Rae in New Zealand.

[12]   It appears, moreover, that New Zealand authorities first reached out to the FBI for assistance after a suspicious activity report was generated related to the Sympatic and Roshaw accounts. (Opp. at 16.)

States government and employees of the U.S. Attorney's Office for the District of New Jersey provided a great deal of information and cooperated with the New Zealand authorities. But cooperation and participation are different from initiation. The Merriam-Webster Dictionary defines "initiate" as "to cause the beginning of (something)." *Initiate*, Merriam-Webster Dictionary, www.merriam-webster.com/dictionary/initiate. Here, Rae has not demonstrated that the U.S. Attorney caused the New Zealand civil proceedings to begin. Instead, it appears that the New Zealand authorities had ample incentive to, and did, initiate these civil proceedings. They learned that Rae might have stashed laundered money in accounts based in New Zealand and reached out to American authorities for more information. The New Zealand authorities, which possessed the sole authority to act in that country, then initiated the civil forfeiture proceedings for their own reasons under their own law. In addition, the New Zealand High Court examined and rejected Rae's argument that New Zealand authorities were acting under the direction or as agents of the United States. (Opp., Ex. 19 ¶ [76].) Thus, because the U.S. Attorney for the District of New Jersey did not initiate the New Zealand proceedings, even if they had been criminal proceedings, their existence could not have breached the Plea Agreement.

      To summarize: the New Zealand proceedings were initiated by New Zealand authorities, not by the U.S. Attorney for the District of New Jersey and were civil forfeiture proceedings, not criminal charges. The United States thus did not breach the Plea Agreement when New Zealand brought the proceedings against the Sympatic and Roshaw accounts.

      As the prosecution points out, this request to be relieved of the money judgment poses certain knotty remedial issues. But because I find that the United States has not violated the Plea Agreement, my inquiry ends and there is no need to determine a remedy. The Plea Agreement stands, and Rae remains obligated to satisfy the remainder of the money judgment.

## ORDER

For the reasons set forth above,

IT IS this 8th day of February, 2022

ORDERED that the motion (DE 99) of defendant Rae for relief from the money judgment component of the plea agreement is DENIED.

The clerk shall file this opinion and order in both of the above-captioned matters.

/s/ Kevin McNulty
_____
**Hon. Kevin McNulty
United States District Judge**